**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **David Leeper,** ) | **Case No. 1:05CV1670** |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Judge John M. Manos** |
| ) | |
| **Ford Motor Company, et al.,** ) | |
| ) | |
| Defendants. ) | **MEMORANDUM OF OPINION** |

On May 16, 2005, David Leeper, Plaintiff, filed the above-captioned case in the Court of Common Pleas for Lorain County, Ohio, against Ford Motor Company ("Ford") and the United Auto Workers Local 425 ("Local 425"), defendants, alleging a breach of the collective bargaining agreement by Ford and a breach of the duty of fair representation by Local 425. On June 24, 2005, defendants filed a Notice of Removal to this Court. Jurisdiction is proper because these claims are preempted by §301 of the Labor Management Relations Act ("LMRA"). See Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 406 (1988); Welch v. General Motors Corp., Buick Motor Div., 922 F2d 287, 290-91 (6th Cir. 1990).

On October 28, 2005, defendants filed separate motions for summary judgment. On February 24, 2006, Plaintiff filed his brief in opposition. On March 17, 2006, defendants filed

separate reply briefs. For the following reasons, the motions are granted.

## I. Facts

### A. Ford

In October 1992, Plaintiff began working at Ford Motor Company in Avon Lake, Ohio, as a production technician. (Leeper Dep. at 18.) In July 2001, he transferred to Ford's Lorain Assembly Plant and worked as an assembly work technician. (Id. at 20). During this time period, he was a member of UAW Local 425 and covered by the Collective Bargaining Agreement ("CBA") between Ford and Local 425. (Id. at 16)

On August 8, 2003, Plaintiff began a medical leave of absence after experiencing anxiety attacks.[1] (Id. at 32, 33). The leave of absence was scheduled to expire on October 15, 2003. On October 25, 2003, Ford received a letter from Rick J. Capasso, PhD., indicating that Plaintiff was not ready to return to work and requesting that his medical leave of absence be extended to December 1, 2003. Ford approved this extension. On January 10, 2004 Ford received another letter from Dr. Capasso requesting Plaintiff's medical leave of absence be extended to February 29, 2004. Once again, Ford approved the extension.

Subsequently, Plaintiff was cleared to return to work, which he attempted to do on March 15, 2004. After arriving at the plant, he began having an anxiety attack and returned home before his shift started without talking to anyone at Ford. (Id. at 49-50)

After this anxiety attack, Plaintiff's leave of absence was extended to March 29, 2004. Subsequent to March 29, he did not return to work; and neither he nor his doctors provided any

---

[1] Plaintiff described his anxiety attacks as: "just anxiety, . . . sweating" and "sweating and breathing." (Id. at 50, 151)

additional requests to extend his medical leave of absence.

During Plaintiff's leave of absence, he received disability insurance checks from Unicare (Ford's Third Party Administrator of its employee welfare plans) on a weekly basis. He alleges that receipt of these checks is how he knew this his leaves of absences had been approved by Ford. (Id. at 42, 43, 45). Other than receiving these checks, he received no other communication from Ford. He testified that at the end of March, or in the first week of April 2004, he stopped receiving disability checks from Unicare. He took no action to determine the status of his leave of absence because he "wasn't worried about it. It was like $450 a week." [2] (Id. at 56, 128-130).

The CBA states as to "failure to report" after a medical leave of absence:

Section 5.  Loss of Seniority
    Seniority shall be broken for the following reasons:
        * * *
    4.  (Failure to Report)
        If the employee does not, within five (5) working days (excluding Saturdays, Sundays, and Holidays) after notice to report has been sent to him/her, either report for work or give a satisfactory reason for his/her absence, unless it is not possible for him/her to comply with either of these requirements; and provided at least ten (10) working days have elapsed since his/her last day worked.
        * * *
        In cases where conditional or approved medical leaves of absence have expired, the Company may send a notice to report.
        Such notice shall be sent by registered mail to the employee's last known address according to the Company's records, and except in cases of recall, the

---

[2] Plaintiff testified that he no longer received disability income because his medical doctor retired. Furthermore, he testified that in order to receive disability checks, a letter must be submitted by a medical doctor (Id. at 52, 53). Plaintiff was seeing two doctors, Dr. Capasso, a forensic psychologist, and Dr. Epply, a psychologist. (Id at 42). Dr. Capasso could not prescribe medications but he wrote letters to Ford requesting medical leave of absences for Plaintiff. (Id.at 33-43). Dr. Epply prescribed Wellbutrin and perhaps Trazodone or "something for anxiety." (Id. at 33). He also sent notices to Unicare for disability purposes. He retired and Plaintiff did not go see another medical doctor. (Id. at 55). Because Plaintiff no longer had a doctor reporting to Unicare, he stopped receiving disability checks.

> notice shall be substantially in the form set forth in Appendix B, attached. The date on the notice shall be the same date the Post Office receives the notice for mailing.
> Disputes as to the Company's failure to observe the procedural requirements of this provision, (e.g., timeliness of notice and transmittal to proper address) and the reasonableness of the employee's failure to respond to a notice where his period of absence can be justified are subject to the regular Grievance Procedure.
> A copy of the notice to report sent an employee will be furnished promptly to the Chairperson of the Unit Committee and to a Unit Committeeperson designated by the local parties. However, failure to furnish a copy to the Chairperson of the Unit Committee and to the designated Unit Committeeperson will not be the basis for any claim.

Collective Bargaining Agreement between UAW and Ford Motor Company, Volume I, Article VIII, Section 5, dated September 15, 2003.

On April 19, 2004, Ford sent a five-day quit letter to Plaintiff by registered mail to his last known address informing him that he must report to work due to the expiration of his medical leave of absence. (Karbler Aff., ¶ 5). On April 21, 2004, the United States Post Office confirmed delivery of the letter to Plaintiff's address of record. Valerie Lovett, Plaintiff's tenant who lived in the lower level of the house and, whose mailing address was identical to that of Plaintiff, signed for the letter. Plaintiff alleges that he had no knowledge that Lovett had received this letter – Lovett never gave him the letter nor mentioned it to him.[3] (Id. at 62) On April 27, 2004, after receiving no response, Ford terminated his employment.

On June 1, 2004, Dr. Capasso sent a letter to Ford attempting to retroactively extend Plaintiff's medical leave to July 19, 2004. (Leeper Dep. Exh 5 (June 1, 2004 letter)). Plaintiff assumed his leave had been extended until that date but never called to verify. (Id. at 68.) On

---

[3]Lovett signed an affidavit stating she signed for the document. As the defendants point out, the affidavit does not state that she did not tell Plaintiff about the letter.

-4-

June 25, 2004, he reported to work to receive his clearance to return after the July break;[4] he alleges that this is the first he learned that his employment had been terminated on April 27, 2004. ( Id. at 67.)

## B. Local 425

On June 25, 2004, (the day Plaintiff discovered he was terminated), he went to see Jack Hall, President of Local 425, about his termination but Hall was not in the office. Plaintiff left no message (Id. at 67). On July 19, 2004, he spoke to Hall over the telephone and explained his situation and asked about possible reinstatement. (Id. at 68-69). Plaintiff did not ask Hall to file a grievance. (Id. at 68-69). Later that day, Plaintiff went to the union hall and asked Tom Rowe, a committeeman for Local 425, to file a grievance.[5][6] (Id. at 69)

On July 27, 2004, Plaintiff again contacted Hall. Plaintiff alleges that Hall confirmed that a grievance had been written and was being processed. (Id. at 74, 75) Hall says that Plaintiff never requested a grievance and he denies he told Plaintiff that a grievance was being processed. (Hall Dep. at 23-24).

On August 12, 2004, Plaintiff called the union and left a message for Rowe. Rowe did not return the call. (Leeper Dep. at 76, 77)

---

[4] The plant shut down for summer break from approximately June 26, 2004 to July 18, 2004.

[5] During the months of July and August 2004, Plaintiff kept notes of all of his contacts and conversations with Local 425 officials concerning his termination. (Leeper Dep. Exh. 7) He states that the notes were made contemporaneously with the conversations. (Id.) There is nothing in his notes indicating that he asked any union official to file a grievance.

[6] Throughout Plaintiff's deposition he was asked whether he or the union on his behalf filed a grievance. His answers were always vague. (Leeper Dep. at 69, 74, 98) When Plaintiff's opposition brief was filed, he attached an affidavit that specifically stated that on July 19, 2004 he asked Tom Rowe to file a grievance. (Leeper Affid. dated Feb. 23, 2006)

The next contact Plaintiff had with Local 425 was in November, 2004, when he left several messages for Hall asking about the status of his job.[7] (Id. at 84). Finally, on November 18, 2004, Hall and Plaintiff were able to talk. Hall told Plaintiff that he had spoken to Ford several times about his termination and his interest in returning to work, but Ford was "just flat telling us no." (Id. at 91).

On May 11, 2005, after the time to appeal had expired, Plaintiff mailed appeal letters to Local 425 and the International Union requesting them to waive the appeal deadline. On July 20, 2005, the International denied the appeal. (Exh. Attached to Leeper Dep.) Plaintiff never received a response from Local 425.

On May 16, 2005, Plaintiff filed this cause of action asserting a breach of the collective bargaining agreement by Ford and a breach of the duty of fair representation by the Local 425. On October 28, 2005, defendants filed separate motions for summary judgment which were fully briefed.

## II. Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The party moving for summary judgment bears the initial burden of production under Rule 56. The burden may be satisfied by presenting affirmative evidence that negates an

---

[7]In November 2004, Plaintiff started making recordings of all phone conversations with union members because he wanted to have an accurate record of events. (Leeper Dep at 79)

-6-

element of the non-movant's claim or by demonstrating "an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

If the movant meets this burden, the non-movant must "set forth the specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The substantive law identifies which specific facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 256 (citing Adickes v. Kress & Co., 398 U.S. 144, 158-59 (1970)). However, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[T]he mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion" for summary judgment. Anderson, 477 U.S. at 247-48.

### III. Law and Analysis

The Sixth Circuit described the §301 process in White v. Anchor Motor Freight, Inc., 899 F.2d 555, 559 (6th Cir. 1990):

> [I]n every hybrid 301 action –breach of collective bargaining agreement and breach of a union's duty of fair representation– are interdependent; if the first claim anchored in the employer's alleged breach of the collective bargaining agreement fails, then the breach of the duty of fair representation claim against the union must necessarily fail with it.

White v. Anchor Motor Freight, Inc., 899 F.2d 555, 559 (6th Cir. 1990) (rehg. and rehg. en banc denied May 31, 1990).

To prevail on a §301 claim, Plaintiff must initially show a breach of the CBA.  If he does not, it is unnecessary to consider the adequacy of the union's representation of him.  Id.

### A. Ford

Plaintiff claims that Ford breached the CBA because it did not send a five-day letter. (Complaint ¶12, Collective Bargaining Agreement, Article VIII, Section 5(4) and Appendix B.) Ford argues that it did not breach any terms of the CBA.  Pursuant to the provisions of the CBA, it sent via registered mail a five-day letter to Plaintiff on April 21, 2004.  When Plaintiff did not respond, Ford terminated him on April 27, 2004.

Plaintiff contends that Ford breached the CBA because his employment termination breached a provision in the CBA which states that one cannot be terminated without "just cause."  CBA, Article IV, Section. 3.  He also argues that Ford should have closely examined the signature on the postal receipt card to verify that Plaintiff received the mail.  He also requests the court to consider extrinsic evidence; specifically, unrelated cases that were arbitrated concerning the issue of receipt of the five-day notice in which employees were reinstated.

As to Plaintiff's first argument that there was no "just cause" to terminate Plaintiff, Ford replied that the CBA specifically provides that if an employee does not respond to a five-day letter, his seniority "shall be" broken and that alone is "just cause" to terminate the employee.

The Court agrees with Ford.  It is clear that the CBA requires an employee to be terminated if he does not respond to the five-day letter.  Furthermore, the CBA provides the employee an opportunity to grieve any dispute as to the procedural requirements (e.g., timeliness of notice and transmittal to proper address).

Here, Ford sent the five-day letter to the proper address.  It complied with the

requirements of the CBA. Plaintiff was a Ford employee and union member since 1992. In 1999, he received two five-day notices (Id. at 57-58). He also testified that he had previously filed a grievance with the union. (Id. at 66). He, as a long-time union member, was aware of the consequences of the five-day notice and aware of the grievance procedure and its timelines. As to Plaintiff's argument that Ford should have examined the signature on the postal card, the CBA does not require Ford to do so. Therefore, for these reasons, the Court finds that Ford did not breach the CBA.

Lastly, Plaintiff cites to extrinsic evidence – arbitrator decisions to interpret the CBA. The defendants contend that use of parol evidence cannot be considered unless the provision being interpreted is ambiguous.

Contract language is ambiguous if it is subject to two reasonable interpretations. Smith v. ABS Indus., 890 F.2d 841, 846-47 n. 1 (6th Cir.1989) (quoting International Union, UAW Local 91 v. Park-Ohio Indus., 876 F.2d 894 (6th Cir.1989) (unpublished per curiam). If a court determines that a contract provision is ambiguous, then it "may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence." Boyer v. Douglas Components Corp., 986 F.2d 999, 1005. Courts may not, however, use extrinsic evidence to create an ambiguity. Rather, the ambiguity must be patent; that is, apparent on the face of the contract. Schachner v. Blue Cross and Blue Shield of Ohio, 77 F.3d 889, 892 (6th Cir. 1996). In Local 783, Allied Industrial Workers v. General Electric Co., 471 F.2d 751, 757 (6th Cir.), cert. denied, 414 U.S. 822 (1973), the Court stated: "After a finding of ambiguity has been made, '[extrinsic evidence] is admissible to aid in its interpretation.'" Id. at 757 (quoting Tennessee Consol. Coal Co. v. United Mine Workers,

416 F.2d 1192, 1198 (6th Cir.1969), cert. denied, 397 U.S. 964 (1970)). In this circuit, before a district court can consider extrinsic evidence of the parties' intent, it must find an ambiguity on the face of the contract. Schachner at 893 (6th Cir. 1996).

The Court concludes that Article VIII, Section 5 Loss of Seniority of the CBA is not ambiguous. It clearly sets forth the requirements Ford must follow. Ford acted in accordance with the terms of the CBA and terminated Plaintiff when he did not respond timely to the five-day letter.

For the above reasons, the Court concludes that Ford did not breach the CBA and therefore its motion for summary judgment is hereby granted. Because the claims of Ford and Local 425 are interdependent of each other, the Court could dismiss the entire complaint without addressing the breach of the union's duty of fair representation, but the Court will address Local 425's duty.

### B. Local 425

Even if Plaintiff could establish that Ford breached the CBA, his §301 claim fails because he cannot show that Local 425 breached its duty of fair representation. Plaintiff's §301 claim against Local 425 alleges that it knew that Ford did not send the five-day letter and therefore violated the CBA when it fired Plaintiff; or Local 425 did not investigate the situation. (Complaint ¶¶ 14, 15.)

"A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171 (1967). The Supreme Court held in Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 67 (1991), that "a union's actions are arbitrary only if, in light of the

-10-

circumstances, the union's behavior is so far outside a wide range of reasonableness, as to be irrational." [internal citation omitted.]

It is settled law that a union's actions in the grievance procedure are also entitled to deferential review.  As explained by the Sixth Circuit in Poole v. Budd Co., 706 F.2d 181, 184 (6th Cir. 1983):

> The grievance process is not expected to be error free and the courts should hesitate to interfere with legitimate internal union decisions which fairly evaluate whether a claim warrants resort to the arbitral machinery.

An employee does not have an absolute right to have his grievance pursued all the way up through arbitration, Vaca v. Sipes, 386 U.S. at 190, and the union need not exhaust every possible remedy requested by the employee.  Walk v. PIE Nationwide, Inc., 958 F.2d 1323, 1326 (6th Cir. 1992).

In order to show "bad faith" or "discriminatory" conduct sufficient to establish a breach of the duty of fair representation, a plaintiff must present "substantial evidence of . . . intentional, severe" discrimination "unrelated to union objectives," Motor Coach Employees v. Lockridge, 403 U.S. 274, 301 (1971), and "hostility" by the union toward the plaintiff and his claim. Humphrey v. Moore, 375 U.S. 335, 342 (1964).  For duty of fair representation purposes, a union's conduct is considered to be "arbitrary" only if, in light of the factual and legal landscape at the time of the union's actions, it is "so far outside a wide range of reasonableness as to be irrational."  Air Line Pilots Ass'n v. O'Neill, 499 U.S. at 67.  In Garrison v. Cassens Transport Co., 334 F.3d 528 (6th Cir. 2003), the Sixth Circuit reaffirmed this deferential standard under the arbitrary prong as follows:

> Mere negligence on the part of a union does not satisfy this requirement. Moreover, ordinary mistakes, errors, or flaws in judgment also will not suffice.

-11-

> That is, 'an unwise or even an unconsidered decision by the union is not necessarily an irrational decision. In essence then, to prevail, a plaintiff has the difficult task of showing that the union's actions were 'wholly irrational.'

Id. at 538-9 (internal citations omitted).

Plaintiff alleges that Local 425 breached its duty of fair representation because it did not investigate his termination and it did not fully use the grievance process on his behalf. (Complaint ¶¶ 14, 15.)

Local 425 argues that it did investigate Plaintiff's termination. Hall, the union president, stated that he personally questioned Ford's human resource employees about the five-day letter. Hall testified that he contacted John Holland, a human resources representative at Ford, during mid-2004, and received evidence concerning Plaintiff's discharge, including, at a minimum, a personnel form indicating that the five day letter had been sent to Plaintiff's home address. (Hall Dep. at 26). Furthermore, Plaintiff testified himself that Hall contacted Ford on several occasions to investigate the matter. (Id. at 91).

The Court finds that Local 425 conducted a reasonable investigation.[8] After doing so it does not have to proceed further, if it believes to do so would be futile. Furthermore, Plaintiff does not present any evidence that Local 425 discriminated or was arbitrary or acted in bad faith. For the above reasons, the Court finds that Local 425 did not breach its duty of fair representation and the Court hereby grants Local 425's motion for summary judgment.

---

[8] The Plaintiff tries to create a material issue of fact as to whether Local 425 filed a grievance on Plaintiff's behalf. The Court finds that whether or not a grievance was filed is not a material question of fact. Local 425 investigated and decided not to proceed so whether a grievance was filed is not relevant.

For the above reasons, the defendants' motions for summary judgment are hereby granted. Plaintiff's complaint is dismissed with prejudice, each party to bear its own costs.

IT IS SO ORDERED.

    /s/ John M. Manos
UNITED STATES DISTRICT JUDGE

Issued:    May 10, 2006